## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

-------------------------------------------------------------x

SUSAN FELTON, individually and on behalf
of all others similarly situated,

          Plaintiff,

   vs.

TEXTRON, INC., LEWIS B. CAMPBELL,
LAWRENCE K. FISH, JOE T. FORD,
KATHLEEN M. BADER, R. KELLY CLARK,
IVOR J. EVANS, LORD POWELL, JAMES L.
ZIEMER, PAUL E. GAGNE, DAIN M.
HANCOCK, LLOYD G. TROTTER, THOMAS B.
WHEELER, TERRENCE C. O'DONNELL, JOHN
DOES 1-10, and DOUGLAS J. STEWART,

          Defendants.

-------------------------------------------------------------x

Civil Action No. _____

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT
INCOME SECURITY ACT

## CA09- 421 ML

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA")

Plaintiff Susan Felton, ("Plaintiff"), individually and on behalf of a class of similarly situated participants in and beneficiaries of the Textron Savings Plan (the "Plan"), alleges the following based upon the investigation of counsel, and upon personal knowledge as to facts pertaining to Plaintiff and on information and belief as to all other facts:

### NATURE OF THE ACTION

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132, against the Plan's fiduciaries, who are and were responsible for the investment of the assets and the administration of the Plan between April 18, 2007 through and including the present (the "Class Period"). During the Class Period, the Plan's fiduciaries, including Textron, Inc. ("Textron" or the

1

"Company") and certain of its senior officers and directors, breached their fiduciary duties owed to the Plan's participants and beneficiaries (collectively, the "Participants"), causing the loss of millions of dollars of Participants' retirement savings.

2.      Throughout the Class Period, the Plan invested heavily in the Textron Stock Fund, which consisted exclusively of Textron common stock, and which was offered as one of the Plan's investment options.  As of the year ended December 31, 2008, over 28% of the Plan's total investments were invested in the Textron Stock Fund.

3.      Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the Participants, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4.      Textron is a multi-industry company that primarily operates in aircraft and financial businesses worldwide.  Textron operates through five segments: Cessna, Bell, Textron Systems, Industrial, and Finance.  Textron's Cessna segment manufactures general aviation aircraft, such as business jets, single engine turboprops, and single engine piston aircraft, as well as provides aftermarket services.  The Cessna segment has manufactured more than 191,000 aircrafts and has consistently been Textron's largest source of revenue of all of its segments.

5.      Textron Financial Corporation, the finance subsidiary of Textron, is a diversified commercial finance company that provides financing programs for products manufactured by Textron.  Textron's Finance segment specializes in Aviation Finance and Golf Equipment Finance, and also manages a portfolio of receivables which it previously originated in various businesses, including, among others, Asset-Based Lending (which provides revolving credit facilities secured by receivable and inventory, related equipment and real estate term loans, and

2

factoring programs across a broad range of manufacturing and service industries) and Structured Capital (which primarily engages in long-term leases of large-ticket equipment and real estate, primarily with investment grade lessees).

6.     Beginning on April 18, 2007, the Company made a series of false and misleading statements about the current business conditions and future outlook for its Cessna and Finance segments. With respect to its Cessna segment, Textron issued a series of false and misleading statements about its backlog of unfilled jet orders, Textron's ability to fill those orders, and the affect of that backlog on Textron's financial growth and outlook. Specifically, Defendants represented that Textron had been generating substantial increases in new business jet orders that strengthened its current business and made Textron poised for continued revenue growth within its Cessna segment in 2008 and beyond. However, in actuality, that backlog of jet orders was a direct result of Textron's acceptance of orders from customers that Defendants knew, or should have known, were financially incapable of paying for their orders. Further, Textron's backlog of jet orders caused the Company to materially overstate its quarterly financial conditions and projected business production for 2008 and beyond.

7.     At the same time, Textron issued a series of false and misleading statements about its Finance segment revenues benefitting from increases in managed receivables, which resulted from Textron's growth in its distribution and aviation finance businesses. However, in actuality, the nationwide credit crisis had caused Textron's Finance segment to incur material losses in the fair market value of its finance receivables and Textron would be required to exit its Asset-Based Lending and Structured Capital businesses.

8.     When, beginning on October 16, 2008, the market began to learn the truth about Textron's inability to fill its backlog jet orders and its need to exit its Asset-Based Lending and

3

Structured Capital businesses, and the severe financial losses suffered by Textron's Cessna and Finance segments, Textron's stock price plummeted. The price of Textron common stock has precipitously declined throughout the Class Period, dropping over 79% from a Class Period trading high of $74.40 per share on December 10, 2007 to a closing price of $15.36 per share on August 31, 2009, a price that is significantly less than the price at which the Plan and its participants were investing in Textron common stock during the Class Period. Consequently, the 79% loss in value of Textron common stock has significantly reduced the overall value of the Plan's assets and Participants' vested retirement benefits.

9. Defendants knew or should have known that during the Class Period, Textron had made a series of material misrepresentations and omissions regarding its Cessna and Finance business segments, which caused Textron's financial results to be overstated and its common stock to trade at artificially inflated levels.

10. While Defendants continued to cause the Plan to hold, and the Plan's Participants to acquire Textron common stock, numerous officers and directors of Textron had been selling shares of their own Textron common stock in unusually large amounts. As alleged below, these Company insiders, including Defendants Campbell and O'Donnell, who were also fiduciaries of the Plan, sold **959,962** shares of their personally held Textron common stock for more than **$55 million** despite allowing the Plan and the Participants to acquire and hold Textron common stock. Yet, Defendants failed to conduct a reasonable investigation into these insider sales and the prudence of the Plan's continued investment in Textron common stock, while those sales were being made.

11. As a result of Defendants' fiduciary breaches, the Plan has suffered substantial losses, resulting in lost profits and the depletion of millions of dollars of the retirement savings

4

and anticipated retirement income of the Plan's Participants. As such, the breaching fiduciaries are obligated under ERISA to restore to the Plan the losses resulting from their fiduciary breaches pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

12.     Because Plaintiff's claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants and beneficiaries of the Plan during the Class Period. Plaintiff also brings this action as a participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

13.     In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief, constructive trust, restitution, and other monetary relief.

**JURISDICTION AND VENUE**

14.     **Subject Matter Jurisdiction**: This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1l32(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the laws of the United States." 28 U.S.C. § 1331.

15.     **Personal Jurisdiction**: ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Rhode Island.

5

16.   **Venue**: Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district.

## THE PLAN

17.   The Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

18.   The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34), in that separate individual Plan accounts are maintained for each participant based upon the amount contributed to each participant's account.

19.   The Plan covers all eligible domestic employees of Textron. Eligible employees are subject to automatic enrollment on the 60th day after their date of hire, if they have not specifically elected to be excluded from the plan. The automatic enrollment is for 3% of eligible compensation per pay period. An employee who is automatically enrolled may elect to change or suspend their enrollment in the plan at any time.

20.   The Plan has two main components: (a) a component in which Plan Participants are entitled to elect compensation deferrals up to 40% of their eligible compensation, within the limits prescribed by Section 401(k) of the Internal Revenue Code; and (b) a component in which the Company matches a portion of the participant's contribution to the Plan based on the contributions made by the participants. Although the matching contributions made by Textron are invested entirely in the Textron Stock Fund, employees have the ability to subsequently reallocate matching contributions among any of the investment options offered in the Plan.

21.   Participants may elect to direct their employee contributions to the following funds:

6

- The Textron Sock Fund;

- 20 different mutual funds; and

- The Total Stable Value Fund, which consists of money market funds, Guaranteed Investment Contracts, and certain common collective trusts.

22.    The portion of the Plan that invests in the Textron Stock Fund is an employee stock ownership plan ("ESOP"), while the remainder of the Plan is a profit-sharing and 401(k) plan.

23.    As of the year ended December 31, 2008, the Plan's total investments were valued at $1,380,183,000, over 28% of which was held in the Textron Stock Fund which held a fair value of investment in the amount of $389,220,000.  The Textron Stock Fund was invested entirely in Textron common stock.

24.    The Plan is a legal entity which can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, Plaintiff seeks relief on behalf of the Plan.

## PARTIES

**Plaintiff**

25.    Plaintiff is and has been a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7) who held investment of Textron common stock in her individual Plan account and has been damaged.

**Defendant Textron**

26.    Textron is a Delaware corporation with its headquarters located at 40 Westminster Street, Providence, Rhode Island 02903.

27.     Textron is a multi-industry company that operates through five segments: Cessna, Bell, Textron Systems, Industrial, and Finance.   The Cessna segment manufactures general aviation aircraft, such as business jets, single engine turboprops, and single engine piston aircraft, as well as provides aftermarket services.   The Finance segment provides aircraft finance, asset-based lending, distribution finance, golf finance, resort finance, and structured capital.   The Bell segment manufactures and supplies helicopters, tiltrotor aircraft, and helicopter-related spare parts and services for both military and commercial applications.   The Textron Systems segment produces precision weapons; airborne and ground-based surveillance systems; intelligence and situational awareness software; armored vehicles and turrets; reciprocating piston aircraft engines; and aircraft and missile control actuators, valves, and related components for the defense, aerospace, and general aviation markets.   The Industrial segment develops and manufactures blow-molded fuel systems cars, light trucks, all-terrain vehicles and watercraft, and windshield and headlamp washer systems; produces metal fuel fillers and engine camshafts for the automotive market; and bottles and plastic containers for food, household, laboratory and industrial uses.   It also manufactures powered equipment, electrical test and measurement instruments, hand and hydraulic powered tools, and electrical and fiber optic connectors; golf cars and off-road utility vehicles powered by electric and internal combustion engines; and turf-maintenance equipment and turf-care vehicles.

28.     Textron's common stock trades on the New York Stock Exchange under the symbol "TXT."   At July 18, 2009, Textron had 270,236,965 shares of common stock outstanding.

**The Director Defendants**

29.     Lewis B. Campbell ("Campbell") has served as Chief Executive Officer of

8

Textron since July 1998, as a director since 1994, and as Chairman of its Board of Directors (the "Board") since 1999. Defendant Campbell also served as President of Textron from 1994 to 1999 and from 2001 to 2009. Defendant Campbell also served as Executive Vice President of Textron from 1992 to 1994 and as Chief Operating Officer of Textron from 1994 to 1998.

30.     Lawrence K. Fish ("Fish") has served as a director of Textron since 1999.

31.     Joe T. Ford ("Ford") has served as a director of Textron since 1998.

32.     Kathleen M. Bader ("Bader") has served as a director of Textron since 2004.

33.     R. Kelly Clark ("Clark") has served as a director of Textron since 2003.

34.     Ivor J. Evans ("Evans") has served as a director of Textron since 2003.

35.     Lord Powell ("Powell") has served as a director of Textron since 2001.

36.     James L. Ziemer ("Ziemer") has served as a director of Textron since 2007.

37.     Paul E. Gagne ("Gagne") has served as a director of Textron since 1995.

38.     Dain M. Hancock ("Hancock") has served as a director of Textron since 2005.

39.     Lloyd G. Trotter ("Trotter") has served as a director of Textron since March 2008.

40.     Thomas B. Wheeler ("Wheeler") has served as a director of Textron since 1993.

41.     Defendants Campbell, Fish, Ford, Bader, Clark, Evans, Powell, Ziemer, Gagne, Hancock, Trotter, and Wheeler are collectively referenced herein as the "Director Defendants."

**Defendant Administrative Committee and Its Members**

42.     The Plan's Administrative Committee (the "Administrative Committee") consisted of various officers and employees of Textron who managed the operation and administration of the Plan.

43.     Terrence O'Donnell ("O'Donnell") joined Textron in 2000 and currently serves as its Executive Vice President and General Counsel. Defendant O'Donnell is charged with

9

overseeing, among other things, Textron's legal, ethics, and compliance functions. Defendant O'Donnell signed the Form 11-K filed by Textron with the Securities and Exchange Commission on June 29, 2009, for the fiscal year ended December 31, 2008 (the "11-K"), on behalf of Textron as the Administrator of the Plan. Upon information and belief, Defendant O'Donnell has, at all relevant times, served as a member of the Administrative Committee.

44.     Nancy Gilman ("Gilman") signed the Form 5500 filed by Textron with the Internal Revenue Service and Department of Labor for the calendar plan year 2007 or fiscal plan year beginning January 1, 2007 and ending December 31, 2007 (the "Form 5500"), as the "individual signing as plan administrator." Upon information and belief, Defendant Gilman has, at all relevant times, served as a member of the Administrative Committee.

45.     John Does 1-10 consist of the remaining Administrative Committee Defendants. Because Plaintiff is currently unaware of the true identities and capacities of the remaining Administrative Committee Defendants, those individuals are named as John Does 1-10. The Administrative Committee Defendants, whose real names will be substituted when they are known to Plaintiff, exercised discretionary authority and discretionary control with respect to the management of the Plan and its assets.

46.     Defendant Douglas J. Stewart ("Stewart") has served as Senior Benefits Generalist of Textron. Defendant Stewart signed the Form 5500 on behalf of Textron as the individual signing as the sponsor of the Plan.

## DEFENDANTS WERE FIDUCIARIES OF THE PLAN

47.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

48.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(A)(1), 29 U.S.C. § 1102(a)(1).  A person is a fiduciary if he is designated a "named fiduciary" under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Additionally, to the extent that a person is delegated responsibilities under the plan or a procedure specified in the plan, he is a named fiduciary under ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

49.     A person can also be a de facto fiduciary as a result of his authority or control over the plan under the very broad definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29 U.S.C. § 1002(21)(A).  A person or entity is a fiduciary where, by his conduct, he engages in fiduciary activities.   Thus, those who have discretionary authority over administering or managing the plan or who exercise authority or control over the plan's assets are fiduciaries regardless of the labels or duties that the plan's language assigns to them.

50.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, Textron chose to internalize this fiduciary function.  The Plan is administered by the Administrative Committee, which has discretionary authority to manage and control the operation and administration of the Plan and investment of its assets.

51.     During the Class Period, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

**Fiduciary Status of Textron**

52.     Textron is a named fiduciary of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(A), because according to the Form 5500, Textron was the Plan Sponsor, and according to the Form 11-K, Textron was the Plan Administrator.

53.     In addition, Textron was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, the Company through its officers, directors or otherwise, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and is therefore a fiduciary of the Plan. Upon information and belief, Textron also exercised discretionary authority with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility.

54.     Textron was a fiduciary to the extent that the Board and/or its employees served on the Administrative Committee.  Upon information and belief, the Administrative Committee Defendants were officers and other employees of Textron who served at the pleasure of the Board.  Based on these facts, Textron had control over the actions of the Administrative Committee and its members and is liable for the Administrative Committee's actions.

55.     Throughout the Class Period, Textron had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their activities related to the Plan.  Through the Board or otherwise, Textron had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, Textron had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan. Accordingly, the actions of the Administrative Committee and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

56.     In addition, Textron acted as a fiduciary in connection with the dissemination of Plan communications to the Plan's Participants.   Textron made direct representations to

12

Participants relating specifically to the Plan's investment options, the business and financial condition of the Company, and the merits of investing the Plan's assets in the Textron Stock Fund, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

57.     Textron was responsible for disseminating a Summary Plan Description ("SPD") for the Plan to Participants.  Textron was also responsible for disseminating to Participants the Plan's prospectus ("Prospectus"), which purported to describe the investment characteristics of the Plan's various investment options.   The Prospectus and all information contained or incorporated therein constitute representations disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plan's assets allocated to their accounts.

58.     Upon information and belief, Textron's filings with the SEC, including but not limited to, annual and quarterly financial reports, press releases, and Registration Statements, were part of the SPD and the Prospectus.  Textron exercised discretion over the contents of the SPDs and the Prospectuses it disseminated, which were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

59.     Under ERISA, Textron was not required to cause the Plan to offer Textron common stock as an investment option under the Plan or to incorporate all of Textron's SEC filings into the Plan's documents, but once it elected to do so, it rendered the disclosures contained in the SEC filings disclosures made in a fiduciary capacity.

**Fiduciary Status of the Director Defendants**

60.     During the Class Period, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) in that they exercised discretionary

13

authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

61.    The Director Defendants were fiduciaries of the Plan in that they issued Plan communications to Plan Participants by signing the Company's Form 10-Ks that were incorporated into the Plan documents during the Class Period.

**Fiduciary Status of the Administrative Committee**

62.    Textron, through the Board, appointed various officers and employees to serve on the Administrative Committee that managed the operation and administration of the Plan. The members of the Administrative Committee were fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration and management of the Plan and/or the Plan's assets, and possessed the full authority in their absolute discretion to determine all questions of eligibility for an entitlement to benefits under the Plan. The Administrative Committee also had the responsibility for selecting, evaluating, monitoring and altering the makeup of the investment alternatives provided under the Plan.

63.    Defendants O'Donnell, Gilman, and John Does 1-10 were fiduciaries of the Plan because they made statements to Plan Participants and they exercised discretionary authority with respect to: (i) managing and administering the Plan; and/or (ii) managing and disposing of the Plan's assets.

64.    Defendant O'Donnell was also a fiduciary of the Plan because he issued Plan communications to Plan Participants by signing the Company's Form 11-Ks that were incorporated into the Plan documents during the Class Period.

14

**Fiduciary Status of Defendant Stewart**

65.     Defendant Stewart, having signed the Form 5500 on behalf of Textron as the individual signing as the Plan's Sponsor, was a fiduciary of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(A).

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

66.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets ...." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

67.     Further, ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants, which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, participants and beneficiaries. Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan's participants will not be injured.

68.     During the Class Period, Defendants made direct and indirect communications with Participants, which included statements regarding investments in the Textron Stock Fund. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions and Prospectuses regarding

15

the Plan's/Participants' holdings of Textron common stock), which incorporated and/or reiterated these statements. These communications were acts of the Plan's administration and Defendants acted as fiduciaries to the extent that they engaged in this activity.

69.     Upon information and belief, Defendants communicated material information necessary for Participants to make informed decisions with respect to the investment of Textron common stock in the Plan, and in an attempt to comply with ERISA Section 404(a)(1)(A) and (B), Defendants referenced and incorporated Textron's SEC filings into documents intended to convey information related to the Plan to Participants. Upon information and belief, Textron's SEC filings were incorporated into Form S-8 registration statements, SPDs, prospectuses and/or other fiduciary communications.

**All of the Defendants Were Co-Fiduciaries**

70.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

## DEFENDANTS' FIDUCIARY DUTIES

71.     ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA, 404(a), 29 U.S.C. § 1104(a).

**The Duty of Prudence**

72.     Section 404(1)(a)(B) imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ...."

16

**The Duty of Loyalty**

73.     ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries .

74.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye-single" to the interests of the participants and beneficiaries, regardless of any other interests, including those of the fiduciaries themselves or the plan sponsor.

**The Duty to Inform**

75.     The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.   These duties recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

76.     Pursuant to the duty to inform, at all relevant times, plan fiduciaries are required under ERISA to furnish certain information to plan participants.  For example, ERISA § 101, 29 U.S.C. § 1021, requires the plan's administrator to furnish an SPD to participants.  ERISA § 102, 29 U.S.C. § 1022, provides that the SPD and all information contained or incorporated in it constitutes representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the plan and in making

decisions concerning their benefits and the investment and management of plan assets allocated to their accounts.

**The Duty to Monitor Appointed Fiduciaries**

77.    Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries who are appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.

**The Duty to Investigate and Monitor Investment Alternatives**

78.    The duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in the Plan, including employer stock, to ensure that each investment is a suitable option for the Plan.

**The Duty to Disregard Plan Documents When Necessary**

79.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

<u>CLASS ACTION ALLEGATIONS</u>

80.    Plaintiff brings this action as a class action pursuant to Rule 23(a), (b)(1)(b), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who are Participants in or beneficiaries of the Plan at any time between April 18, 2007 through and including the present, and whose accounts held Company stock or units in the Textron Stock Fund.

81.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

but can be ascertained readily through appropriate discovery, upon information and belief there

are at least thousands of members of the Class who participated in, or were beneficiaries of, the

Plan during the Class Period.   According to the Form 5500, there were 38,884 total participants,

active, retired or separated entitled to or currently receiving benefits under the Plan, as of the end

of the plan year ending December 31, 2007.

82.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.   Among the

questions of law and fact common to the Class are:

> (a)     whether Defendants each owed a fiduciary duty to Plaintiff
> and members of the Class;
>
> (b)     whether Defendants breached their fiduciary duties to
> Plaintiff and members of the Class by failing to act
> prudently and solely in the interests of the Plan's
> Participants;
>
> (c)     whether Defendants violated ERISA; and
>
> (d)     whether Plaintiff and members of the Class have sustained
> damages and, if so, what is the appropriate measure
> thereof?

83.     Plaintiff's claims are typical of the claims of the members of the Class because

Plaintiff and the other members of the Class each sustained a diminution of vested benefits

arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

84.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class action, ERISA, and complex

civil and commercial litigation.   Plaintiff has no interests antagonistic to or in conflict with those

of the Class.

85.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B)

19

because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members of the Class or parties to the actions, or substantially impair or impede their ability to protect their interests.

86.     Class action status is also warranted under 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

87.     Class action status is additionally warranted under 23(b)(3) because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## MISLEADING STATEMENTS AND OMISSIONS ABOUT TEXTRON'S CESSNA AND FINANCE SEGMENTS

88.     In its Form 10-Q filed with the SEC on April 30, 2007, Textron stated that its four reportable segments (Bell, Cessna, Industrial and Finance) "reflect the manner in which we manage our operations. Segment profit is an important measure used to evaluate performance and for decision-making purposes."[1]     Reiterating the significance of segment reporting for evaluating Textron's current business condition and future outlook, Textron filed a Form 10-Q with the SEC on July 31, 2009, stating that "Segment profit is an important measure used for evaluating performance and for decision-making purposes." This is particularly the case with the Cessna segment, as the majority of Textron's reported revenue and profits are derived from this segment. Indeed, for the fiscal year 2007, 38% of Textron's segment revenues were derived

---

[1]     Beginning in the fiscal year 2008, Textron reported financial results for five business segments, instead of four, adding its Textron Systems division.

from its Cessna segment and 53% of Textron's segment profits were earned by its Cessna segment.

89.    Thus, the financial information for Textron's Cessna and Finance segments reported in SEC filings and press releases was an influential resource used by the Plan's Participants in determining the financial condition of Textron and the prudence of investing their retirement savings in Textron common stock.

90.    Throughout the Class Period, Textron and its officers and directors repeatedly issued materially inaccurate statements that misrepresented the prosperity of Textron's Cessna and Finance segments. Specifically, Textron issued false and misleading statements regarding its backlog of unfilled jet orders in its Cessna segment and Textron's ability to fill those orders. At the same time, Textron issued a series of false and misleading statements regarding the strength of its Asset-Based Lending and Structured Capital businesses within the Finance segment and the material, negative impact of economic downturns on the Finance segment. These material misrepresentations and omissions caused Textron to materially overstate its quarterly financial condition and projected business production for 2008 and beyond, and caused Textron common stock to trade at artificially inflated prices throughout the Class Period.

91.    On April 18, 2007, Textron issued a press release entitled *Textron Delivers Strong First Quarter Results*, reporting a 30% increase in earnings per share from continuing operations on a 12.6% revenue increase for the first quarter, 2007. In that press release, Defendant Campbell proclaimed that, "We outperformed again this quarter with strong organic revenue growth and improved profitability. **Demand for our products and further improvements in enterprise management continue to drive enhanced results**." Textron announced that it "also raised earnings guidance for 2007, reflecting continued expectations of solid top-line growth and

strong operational performance." With respect to the Company's 2007 outlook, Defendant Campbell added, "Continued revenue growth across the portfolio combined with the momentum of our operational improvement initiatives provide us with greater confidence in our outlook for 2007. **Add to these factors, further visibility in our aircraft businesses, and our outlook longer-term is clearly positive as well**." (emphasis added).

92.     In its first quarter segment results for its Cessna segment, Textron reported that revenues at Cessna increased $99 million primarily due to Citation business jet mix and favorable pricing, profit increased $38 million as a result of higher pricing and mix, partially offset by inflation and increased development expenses. Moreover, Textron reported that **"Cessna's backlog increased to $9.0 billion at the end of the first quarter from $8.5 billion at the end of last year**." (emphasis added).

93.     In its first quarter segment results for its Finance segment, Textron reported that revenues in the Finance segment increased $28 million primarily due to higher average finance receivables and a higher interest rate environment, and profit increased $3 million as the benefits from higher finance receivables, higher securitization gains and lower provision for loan losses were partially offset by a residual value impairment charge and lower pricing spreads.

94.     At the close of trading on April 18, 2007, Textron common stock traded at a price of $45.69 per share.[2]

95.     On April 30, 2007, Textron filed a Form 10-Q with the SEC reporting its financial results for the first quarter 2007. In its "Business Overview," Textron announced that its 13% "revenue growth was largely due to a favorable mix of Citation business jets at Cessna and…Finance revenues benefited from an increase of about $500 million in managed receivables

---

[2]     The stock price, and all subsequently cited closing prices herein, reflect the adjusted closing prices for dividends and stock splits. On August 27, 2007, Textron issued a 2:1 stock split.

since the end of last year. Earnings increased due to the impact of the higher revenues and our

improved operating performance, which drove the increase in earnings per share."

96.     With respect to the quarterly revenue and profit for its Cessna and Finance

segments, Textron reported:

**Cessna Revenues**

Revenues at Cessna increased $99 million in the first quarter of 2007, compared with
2006 due to favorable Citation jet mix of $63 million and pricing of $44 million.  We
delivered 67 Citation business jets in both the first quarter of 2007 and 2006.

**Segment Profit**

Segment profit increased $38 million at Cessna in the first quarter of 2007, compared
with 2006 primarily due to higher pricing of $44 million and the impact of favorable
product mix of $17 million, partially offset by inflation of $18 million and increased
product development expenses of $7 million.

**Finance Revenues**

Revenues in the Finance segment increased $28 million in the first quarter of 2007,
compared with 2006. The increase was primarily due to a $33 million increase related to
higher average finance receivables and an $11 million increase from a higher interest rate
environment, partially offset by $11 million in lower leveraged lease earnings due to an
unfavorable cumulative earnings adjustment attributable to the recognition of a residual
value impairment.  Average finance receivables increased primarily due to growth in the
distribution and aviation finance businesses.

**Segment Profit**

Segment profit in the Finance segment increased $3 million in the first quarter of 2007,
compared with 2006 primarily due to a benefit from higher average finance receivables
of $16 million, partially offset by $11 million in lower leveraged lease earnings due to an
unfavorable cumulative earnings adjustment attributable to the recognition of a residual
value impairment.

97.     At the close of trading on April 30, 2007, Textron common stock traded at a price

of $48.51 per share.

98.     On August 27, 2007, Textron filed a Form 10-Q with the SEC reporting its

financial results for the second quarter 2007, reporting that:

23

**Backlog in the Cessna and Bell Helicopter businesses grew to $14.0 billion at the end of second quarter of 2007, compared to the end of 2006**, reflecting an increase of approximately $1.9 billion at Cessna and $500 million at Bell Helicopter, primarily for the V-22 Lot 11 contract. **At Cessna, new business jet orders outpaced deliveries by 2.5 to 1 in the first half of 2007, essentially filling out the 2008 delivery plan of approximately 470 jets. In comparison, we expect to deliver about 380 jets in 2007.**

(Emphasis added).

99.     Textron further announced its segment results for Cessna, stating:

Cessna has continued to grow its revenues and segment profit due, in part, to its increased international deliveries, as over half of our 95 Citation business jets in the second quarter of 2007 went to international customers, primarily in Europe and Latin America. We delivered a total of 76 jets in the second quarter of 2006. In May, the Mustang became the first new-generation entry level jet to be certified in Europe. We have continued to ramp up our Mustang production with 10 aircraft delivered in the second quarter of 2007.

Revenues at Cessna increased $198 million in the second quarter of 2007, compared with 2006 due to higher volume of $147 million, primarily related to Citation business jets, and higher pricing of $51 million. Segment profit increased $47 million at Cessna in the second quarter of 2007, compared with 2006 primarily due to higher pricing of $51 million and the impact of the higher volume of $31 million, partially offset by inflation of $26 million and increased product development expense of $9 million. Favorable warranty performance of $9 million resulting from lower point of sale warranty costs for aircraft sold during the second quarter of 2007, compared with 2006, was offset by other favorable warranty performance of $10 million recorded in 2006.

Revenues at Cessna increased $297 million in the first half of 2007, compared with 2006 due to higher volume of $202 million, primarily related to Citation business jets, and higher pricing of $95 million. Segment profit increased $85 million at Cessna in the first six months of 2007, compared with 2006 primarily due to higher pricing of $95 million and the impact of the higher volume of $47 million, partially offset by inflation of $44 million and increased product development expense of $16 million. Favorable warranty performance of $16 million resulting from lower point of sale warranty costs for aircraft sold during the first half of 2007, compared with 2006, was offset by other favorable warranty performance of $19 million recorded in 2006.

100.    Representing a similarly positive outlook on its Finance segment, Textron stated:

The Finance segment continued to grow its managed finance receivables with a 5%, or $507 million, increase since the end of 2006. In addition, our already strong portfolio quality statistics continued to improve.

Revenues in the Finance segment increased $47 million in the second quarter of 2007, compared with 2006. The increase was primarily due to a $26 million increase related to higher average finance receivables and a $21 million gain on the sale of a leveraged lease investment. Average finance receivables increased primarily due to growth in the aviation, distribution and resort finance businesses, partially offset by an increase in the level of distribution finance receivables sold.

Profit in the Finance segment increased $12 million in the second quarter of 2007, compared with 2006 primarily due to a $21 million gain on the sale of a leveraged lease investment and a $12 million increase related to higher average finance receivables, partially offset by a $12 million increase in the provision for losses and $8 million related to the impact of competitive pricing pressures. The increase in provision for losses is primarily attributable to $5 million of higher provision for losses related to specific reserving actions taken on one account in the media finance portfolio, and a $6 million reduction in 2006 in the rate utilized to establish the allowance for losses in several portfolios due to improvements in credit quality.

Revenues in the Finance segment increased $75 million in the first half of 2007, compared with 2006. The increase was primarily due to a $59 million increase related to higher average finance receivables, a $21 million gain on the sale of a leveraged lease investment and a $15 million increase from a higher interest rate environment, partially offset by $13 million in lower leveraged lease earnings due to an unfavorable cumulative earnings adjustment attributable to the recognition of residual value impairments. Average finance receivables increased primarily due to growth in the aviation, distribution and resort finance businesses, partially offset by an increase in the level of distribution finance receivables sold.

Profit in the Finance segment increased $15 million in the first half of 2007, compared with 2006 primarily due to a $28 million increase related to higher average finance receivables and a $21 million gain on the sale of a leveraged lease investment, partially offset by $13 million in lower leveraged lease earnings due to an unfavorable cumulative earnings adjustment attributable to the recognition of residual value impairments, $12 million related to the impact of competitive pricing pressures and an $8 million increase in the provision for losses, largely due to one account.

101.    At the close of trading on July 27, 2007, Textron common stock traded at a price

of $54.61 per share.

102.    On October 29, 2007, Textron filed a Form 10-Q with the SEC reporting its

25

financial results for the third quarter 2007, reporting that Textron "**delivered another solid quarter, with many indications that our growth will continue into the future**. We achieved a 40% increase in earnings per share from continuing operations on a 15% increase in revenues compared to the third quarter of 2006. **Backlog in our Cessna and Bell Helicopter businesses grew by $4 billion to $15.6 billion at the end of third quarter of 2007, compared with the end of 2006, with approximately $3.5 billion of this increase at Cessna** and $525 million at Bell Helicopter." (emphasis added).

103.   Textron further announced:

Cessna has continued to grow its revenues and segment profit due, in part, to its increased international deliveries. Approximately half of our 103 Citation business jet deliveries in the third quarter of 2007 went to international customers, primarily from Europe, compared to approximately 40% in the corresponding quarter of 2006, when we delivered a total of 73 jets.

Cessna's revenues and segment profit increased $218 million and $60 million, respectively, in the third quarter of 2007, compared with the corresponding quarter of 2006. Revenues increased due to higher volume of $166 million, primarily related to Citation business jets, and higher pricing of $53 million. Segment profit increased primarily due to the higher pricing, along with the impact of the higher volume of $44 million and a $6 million gain representing a portion of the insurance settlement discussed on page 14. These increases to segment profit were partially offset by inflation of $26 million and increased product development expense of $13 million.

Cessna's revenues and segment profit increased $515 million and $145 million, respectively, in the first nine months of 2007, compared with the corresponding period of 2006. Revenues increased due to higher volume of $367 million, primarily related to Citation business jets, and higher pricing of $148 million. Segment profit increased primarily due to the higher pricing, along with the impact of the higher volume of $91 million, partially offset by inflation of $70 million and increased product development expense of $29 million.

104.   With respect to its Finance segment, Textron stated:

During 2007, the Finance segment experienced continued growth in its managed finance receivable portfolio. Managed finance receivables grew by $374 million, or 4%, from year-end 2006, primarily in aviation finance, resort finance and asset-based lending. We expect an increased growth rate in the Finance segment's core

26

portfolios during the fourth quarter of 2007, primarily due to seasonal increases in equipment dealer floorplan inventory in the distribution finance group.

**The disruption in the credit market during the third quarter of 2007 had minimal impact on our Finance segment's ability to access the capital markets as it has been able to refinance its maturing commercial paper obligations and fund its commitments to borrowers with only a slight deterioration in interest margin.**

Revenues and segment profit in the Finance segment increased $2 million and $1 million, respectively, in the third quarter of 2007, compared with the corresponding quarter of 2006. Both revenues and segment profit for the quarter were affected by a $10 million increase in securitization and other fee income, which was partially offset by the recognition of $7 million of earnings on the sale of an option related to a leveraged lease asset in 2006. The increase in revenues was also due to the $5 million impact of higher average finance receivables, primarily due to growth in the aviation and resort finance businesses, partially offset by an increase in the level of distribution finance receivables sold, and a $4 million decrease in portfolio yields due to competitive pricing pressures. Segment profit also increased due to $4 million in lower provision for losses attributable to lower growth in the receivable portfolio in the third quarter of 2007, partially offset by the impact of higher selling and administrative expenses of $3 million.

Revenues and segment profit in the Finance segment increased $77 million and $16 million, respectively, in the first nine months of 2007, compared with the corresponding period of 2006. Average finance receivables were higher due to growth in the distribution, aviation and resort finance businesses, partially offset by an increase in the level of distribution finance receivables sold, and accounted for $65 million of the revenue increase and $30 million of the segment profit increase. Both revenues and segment profit for the nine-month period were also affected by a $21 million gain on the sale of a leveraged lease investment and $12 million in higher securitization gains, partially offset by $13 million in lower leveraged lease earnings due to an unfavorable cumulative earnings adjustment attributable to the recognition of residual value impairments, a $7 million reduction in leveraged lease earnings from the adoption of FSP 13-2 and the recognition of $7 million in earnings on the sale of a option related to a leveraged lease asset in 2006. The revenue increase was also due to the $15 million impact from the higher interest rate environment and $10 million in other fee income, partially offset by an $18 million decrease in portfolio yields related to competitive pricing pressures. The increases in segment profit were partially offset by higher selling and administrative expenses of $11 million.

(Emphasis added).

105.    At the close of trading on October 29, 2007, Textron common stock traded at a

price of $66.10 per share.

106.    On February 20, 2008, Textron filed a Form 10-K with the SEC for the fiscal year

ended December 29, 2007, reporting increased revenues and profits for Textron's Cessna and

Finance segments.  Specifically, Textron reported:

**Revenues**

Revenues increased $1.7 billion, or 15%, to $13.2 billion in 2007, compared with 2006.
The primary reasons for this increase are:

> • Higher manufacturing volume of $1.0 billion with $631 million at
> Cessna, primarily related to an increase in business jet deliveries; $253
> million in Bell's U.S. Government business, largely related to the H-1
> program and higher armored security vehicle ("ASV") deliveries; and a
> $148 million increase in the Industrial segment, principally due to higher
> demand at Kautex; [and]
>
> ***
>
> • A $66 million impact from higher average finance receivables due to
> growth in the aviation and resort finance businesses in the Finance
> segment.

107.    In detailing the revenue and profits earned by the Cessna and Finance segments,

the 10-K stated:

**Cessna**

**Demand in the business jet market continued to strengthen in 2007, which
was reflected in a 49% increase in our backlog, in addition to a 26% increase
in business jet deliveries.**  Over the past three years, Cessna has increased its
annual production rate and has continued to focus on improving margins while
investing in engineering, research and development in Cessna's continual effort to
bring new technology and products to market. Citation business jets are the
largest component of Cessna's revenues. We delivered 387, 307 and 252 Citation
business jets in 2007, 2006 and 2005, respectively.

**Cessna Revenues**

In 2007, Cessna's revenues increased $844 million, compared with 2006, due to
higher volume of $631 million, primarily due to higher Citation business jet
deliveries, and improved pricing of $212 million. In 2006, revenues increased
$676 million, compared with 2005, due to higher volume of $493 million,
primarily related to Citation business jets, and improved pricing of $183 million.

28

**Cessna Segment Profit**

In 2007, Cessna's segment profit increased $220 million, compared with 2006, primarily due to improved pricing, along with the $139 million impact of higher volume and favorable warranty performance of $14 million, partially offset by inflation of $106 million and increased engineering and product development expense of $41 million. Favorable warranty performance included the $19 million impact of lower estimated warranty costs for aircraft sold in 2007 related to initial model launches as discussed below, partially offset by a lower benefit of $5 million from other favorable warranty performance (a $28 million benefit in 2007, compared with $33 million in 2006).

Segment profit increased $188 million at Cessna in 2006, compared with 2005, primarily due to improved pricing, the $102 million impact of higher volume and favorable warranty performance of $39 million, partially offset by inflation of $112 million and higher engineering and product development costs of $41 million. Favorable warranty performance included the $24 million impact of lower estimated warranty costs for aircraft sold in 2006 related to initial model launches as discussed below, as well as a $15 million incremental benefit from other favorable warranty performance in 2006 (a $33 million benefit in 2006, compared with $18 million in 2005).

During initial model launches, Cessna typically incurs higher warranty-related costs until the production process matures, at which point warranty costs generally moderate. For the Sovereign and CJ3 production lines, in the second half of 2006 management estimated that the production lines had reached this maturity level based on historical production and warranty patterns, resulting in lower estimated warranty costs than earlier production aircraft. Accordingly, Cessna has had favorable warranty performance in the past two years due to the lower point-of-sale warranty costs for Sovereign and CJ3 aircraft sold. Management expects improved performance on these models to continue in the foreseeable future.

**Finance**

During 2007, our Finance segment's managed finance receivables grew by 9% to $11 billion, while our portfolio quality statistics remained relatively stable. As a percentage of finance receivables, our 60+ day delinquency decreased to 0.43% at the end of 2007 from 0.77% at the end of 2006, while nonperforming assets as a percentage of finance assets increased to 1.34% from 1.28%, respectively. Managed finance receivables include finance receivables that are owned and reported on our balance sheet, along with securitized or sold finance receivables for which risks of ownership are retained to the extent of our subordinated interests. **In 2008, we expect continued growth in our managed finance**