receivables at a moderate pace and continued stability in our portfolio quality statistics.

**The disruption in the credit market during the second half of 2007 had minimal impact on our Finance segment's ability to access the capital markets to refinance its maturing debt obligations and to fund growth in the finance receivable portfolio.** However, this disruption in the credit markets did result in an increase in our borrowing costs. The increase in the spread between the London Interbank Offered Rate ("LIBOR"), the primary index against which our variable-rate debt is priced, and the Federal Funds rate had an $11 million negative impact on borrowing spreads. This negative impact was almost completely mitigated by the issuances of new lower cost debt.

## Finance Revenues

Revenues in the Finance segment increased $77 million in 2007, compared with 2006. Our revenue growth is primarily attributed to the following factors:

- Higher average finance receivables of $722 million, primarily due to growth in the aviation and resort finance businesses, which resulted in additional revenues of $66 million;
- $21 million gain on the sale of a leveraged lease investment; and
- $20 million increase in securitization income, primarily related to a $588 million increase in the level of receivables sold into the distribution finance revolving securitization.

## Finance Segment Profit

Segment profit in the Finance segment increased $12 million in 2007, compared with 2006, primarily due to a $30 million increase in net interest margin, partially offset by an $11 million increase in selling and administrative expenses, largely attributable to finance receivable portfolio growth and a $7 million increase in provision for loan losses, reflecting an increase in nonperforming assets and net charge-offs in the distribution finance portfolio. Net interest margin increased due to a number of factors, including the following:

- An increase of $56 million in securitization and other fee income as described above, and
- An increase of $30 million related to growth in average finance receivables;
- Partially offset by a $17 million decrease in portfolio yields related to competitive pricing pressures;
- Lower leveraged lease earnings of $13 million due to an unfavorable cumulative earnings adjustment attributable to the recognition of residual value impairments;
- Higher borrowing costs of $11 million relative to the Federal Funds rate;
- A reduction in leveraged lease earnings of $8 million from the adoption of a new accounting standard; and

• Lower leveraged lease earnings of $7 million due to a gain in 2006 on the sale of an option related to a leveraged lease asset.

(Emphasis added).

108.    At the close of trading on February 20, 2008, Textron common stock traded at a price of $54.12 per share.

109.    On April 25, 2008, Textron filed a Form 10-Q with the SEC reporting its financial results for the first quarter 2008, reporting that:

> **Backlog in the aircraft and defense businesses grew by $3.3 billion to $22 billion at the end of first quarter of 2008, compared to the end of 2007. Approximately $1.9 billion of this increase was at Cessna and $1.4 billion at Bell. At Cessna, new business jet orders outpaced deliveries by 2.5 to 1, with 66% of these new orders from international customers, compared with approximately 47% in the first quarter of 2007.** Bell's backlog increased as a result of a multi-year procurement contract entered into in March for the V-22 tiltrotor aircraft, which added $1.2 billion to backlog for the first funded lot and certain advanced procurement for additional lots. The remaining contract value of $4.7 billion will be reflected in backlog as each subsequent production lot is funded.

(Emphasis added).

110.    In its individual segment analysis, Textron reported:

**Cessna**

In the first quarter of 2008, Cessna's revenues and segment profit increased $278 million and $52 million, respectively, compared with 2007. Revenues increased largely due to higher volume of $212 million, reflecting higher Citation business jet deliveries, improved pricing of $58 million and an $8 million benefit from a newly acquired business. We delivered 95 jets in the first quarter of 2008, compared with 67 jets in the first quarter of 2007. Segment profit increased primarily due to improved pricing of $58 million, the $44 million impact from higher volume and favorable warranty performance of $12 million, partially offset by inflation of $32 million and increased engineering and product development expense of $18 million.

**Finance**

Revenues in the Finance segment increased $4 million in the first quarter of 2008, compared with 2007, primarily due to a $14 million increase in securitization

31

gains and other fee income, last year's $11 million reduction in revenues upon the recognition of a residual value impairment and $5 million in higher revenues resulting from $267 million in higher average finance receivables. These increases were largely offset by a $28 million decrease in revenues as a result of the decline in market interest rates. The increase in securitization gains was primarily attributable to the sale of an additional $180 million of receivables into the Aviation Finance securitization and the increase in other fee income was primarily the result of a gain on the sale of our remaining interest in a leveraged lease investment and increased syndication fees.

Profit in the Finance segment decreased $10 million in the first quarter of 2008, compared with 2007, primarily due to a $22 million increase in the provision for loan losses and a $10 million impact on net margin due to an increase in borrowing costs relative to various market rate indices, partially offset by the increase in securitization gains and other income of $14 million and the impact of last year's $11 million reduction in revenues upon the recognition of a residual value impairment. The increase in the provision for loan losses was primarily driven by a $15 million reserve established for one account in the asset-based lending portfolio and weakening portfolio quality in the distribution finance portfolio as general U.S. economic conditions have impacted borrowers in certain industries.

Borrowing costs increased relative to various market rate indices as credit market volatility continued during the quarter. The increase was primarily driven by two factors. The majority of our variable-rate term debt resets quarterly based on LIBOR and a substantial portion of our variable-rate assets reset monthly based on the Prime rate. Based on this mismatch, the Prime rate reductions in the quarter were reflected in our finance receivable portfolio yield in advance of being reflected in our borrowing costs. In addition, we experienced increased borrowing spreads on issuances of commercial paper and term debt in comparison with 2007.

111.   At the close of trading on April 25, 2008, Textron common stock traded at a price of $59.48 per share.

112.   On July 25, 2008, Textron filed a Form 10-Q filed with the SEC reporting financial results for the second quarter 2008.  With respect to its backlog of Cessna orders, Textron declared that:

**Backlog in the aircraft and defense businesses grew by $4.7 billion to $23.5 billion at the end of the second quarter of 2008, compared to the end of 2007. Approximately $3.4 billion of this increase was at Cessna** and $1.4 billion at Bell.  At Cessna, approximately 70% of the new business jet orders were

32

from international customers in the first half of 2008, compared with approximately 45% in the first half of 2007. Approximately $2.2 billion of Cessna's backlog relates to the Columbus aircraft with initial customer deliveries expected to begin in 2014. Bell's backlog increased as a result of a multi-year procurement contract entered into in March for the V-22 tiltrotor aircraft, which added $1.1 billion to backlog for the first funded lot and certain advanced procurement for additional lots. The remaining contract value of $4.7 billion will be reflected in backlog as each subsequent production lot is funded.

(Emphasis added).

113.    In further reporting financial results for its Cessna segment, Textron announced:

In the second quarter of 2008, Cessna's revenues and segment profit increased $298 million and $62 million, respectively, compared with the second quarter of 2007. Revenues   increased largely   due   to   higher   volume   of   $212 million, reflecting higher Citation business jet deliveries, improved pricing of $69 million and a $17 million benefit from a newly acquired business. We delivered 117 jets in the second quarter, compared with 95 jets in the second quarter of 2007. Segment profit increased primarily due to the $63 million impact from higher volume and pricing in excess of inflation of $31 million, partially offset by higher engineering and product development expense of $16 million.

In the first half of 2008, Cessna's revenues and segment profit increased $576 million and $114 million, respectively, compared with the first half of 2007. Revenues increased largely due to higher volume of $424 million, reflecting higher Citation business jet deliveries, improved pricing of $127 million and a $25 million benefit from a newly acquired business. We delivered 212 jets in the first half of 2008, compared with 162 jets in the first half of 2007. Segment profit increased primarily due to the $107 million impact from higher volume, pricing in excess of inflation of $57 million and favorable warranty performance of $16 million, partially offset by higher engineering and product development expense of $34 million.

## THE TRUTH ABOUT TEXTRON'S
## CESSNA AND FINANCE SEGMENTS BEGINS TO EMERGE

114.    Beginning on October 16, 2008, Textron disclosed the truth about the business conditions and future outlook for its Cessna and Finance segments. Notably, Textron disclosed its inability to obtain payment and secure delivery for billions of dollars worth of backlogged aircraft orders that Textron had accounted for in reporting the above financial results for its Cessna Segment. Textron further disclosed material weaknesses in the performance of its

Finance segment, and Textron's sudden need to exit its Asset Based Lending and Structured Capital operations within the Finance segment.

115.    As the investing public became aware of these problems, the price of Textron common stock plummeted throughout the Class Period.

116.    On October 16, 2008, Textron filed a Form 8-K with the SEC, attached to which was a press release entitled *"Textron Reports Third Quarter EPS from Continuing Operations of $0.85,"* announcing that Textron was downsizing its subsidiary, Textron Financial Corporation ("TFC") by "**exiting its Asset Based Lending and Structured Capital segments, and several additional product lines through an orderly liquidation** as market conditions allow. TFC will also limit new originations in its Distribution Finance, Golf, and Resort portfolios, consistent with maintaining franchise value and our commitment to service existing credit-worthy customers." (emphasis added). As a result of this downsizing, "Textron expects to take a non-cash impairment charge in the fourth quarter of up to $169 million, which represents the current goodwill balance at TFC. The company will also incur restructuring charges for headcount reductions and consolidations."

117.    In addition, the press release reported the following financial losses within its Finance segment:

> Finance revenues decreased $30 million in the third quarter, due to lower market interest rates partially offset by the benefits of higher volume and interest rate floors. Segment profit decreased $36 million due to an increase in the provision for loan losses and higher borrowing costs, partially offset by the benefit of interest rate floors.
>
> Borrowing costs increased relative to the target Federal Funds rate as credit market volatility continued during the quarter. The increased borrowing costs were driven by a widening in the spread between LIBOR and the target Federal Funds rate and, to a lesser extent, from increased borrowing spreads on debt in comparison with 2007. These increases were substantially offset by increased receivable pricing as a result of variable-rate receivables with interest rate floors.

Sixty-day plus delinquencies increased to 1.06 percent of finance receivables from 0.61 percent at the end of the second quarter. Nonperforming assets increased to 2.67 percent of total finance assets from the second quarter level of 2.31 percent.

118.   At the close of trading on October 16, 2008, Textron common stock had declined to a trading price of $19.76 per share.

119.   In connection with its October 16, 2008 press release, Textron filed a Form 10-Q on October 29, 2008, re-affirming the financial losses of its Finance segment for the third quarter 2008. On top of the disclosures made in the October 16 press release, Textron added that:

> Portfolio quality statistics weakened during the first nine months of 2008, compared to year-end 2007.  The increase in nonperforming assets is primarily the result of one troubled account in the asset-based lending business and one troubled account in the golf finance division; however, nonperforming assets and net charge-offs also increased significantly in the distribution finance division reflecting weakening U.S. economic conditions.  **We expect nonperforming assets and charge-offs to remain high for the remainder of 2008 compared to the strong portfolio performance of 2007. As a result of this trend, we have increased our allowance for losses on finance receivables by $48 million, or 54%, during the first nine months of 2008.**

(Emphasis added).

120.   At the close of trading on October 29, 2008, Textron common stock traded at $14.39 per share, a drop of approximately **76%** from its closing price of $59.48 per share on April 25, 2008, the date that Textron filed its Form 10-Q for the first quarter 2008.

121.   Further evidencing the severe turmoil within its Finance segment, Textron filed a Form 8-K with the SEC on December 22, 2008, announcing that:

> On December 22, 2008, the Board of Directors of Textron Inc. ("Textron") **approved a plan to exit all of the commercial finance business of Textron's finance segment, Textron Financial Corporation and its subsidiaries** ("TFC"), other than that portion of the business supporting the financing of customer purchases of Textron-manufactured products. **Textron made the decision to exit this business due to continued weakness in the economy** and in order to enhance Textron's long-term liquidity position in light of continuing disruption and instability in the capital markets.

Textron had previously indicated that TFC would be exiting its Asset Based Lending and Structured Capital segments, as well as several additional product lines, representing about $2.0 billion in managed receivables. The revised exit plan now applies to approximately $7.9 billion of TFC's $11.4 billion managed receivable portfolio. The exit plan will be effected through a combination of orderly liquidation and selected sales and is expected to be substantially complete over the next two to four years.

Approximately $3.5 billion of the liquidating receivables are now designated for sale or transfer, of which about $1.3 billion are securitized receivables managed by TFC and $2.2 billion are owned assets classified as held for sale. Accordingly, as a result of the exit plan, in the fourth quarter, Textron will record an approximate $250 - $300 million pre-tax mark-to-market adjustment against owned assets held for sale. Also, due to this change in investment status relative to TFC's Canadian subsidiary, Textron will recognize non-cash tax charges of about $31 million. These adjustments are in addition to the previously reported $169 million non-cash, pre-tax impairment charge to eliminate TFC's goodwill.

In addition to the actions at TFC, on December 22, 2008, the Textron Board of Directors also approved an expansion of Textron's previously announced overhead cost reduction and productivity improvement plan for estimated cost savings of approximately $100 million in 2009. **The program, along with other volume-related reductions in workforce, eliminates approximately 2,200 positions worldwide.**

Textron now expects to record pre-tax restructuring costs of about $65 million in the fourth quarter of 2008 related to the TFC exit plan and the restructuring program, inclusive of the restructuring charges previously reported. In addition, **Textron anticipates that it will likely have additional restructuring costs in 2009 and later, as a result of further headcount reductions and other actions in its various business units,** including TFC, however, an estimate of these charges cannot be made at this time.

(Emphasis added).

122.    Upon this news, Textron common stock closed at a trading price of $12.13 per share on December 23, 2008, a drop of 21% compared to the opening trading price of $15.27 per share on December 22, 2008.

123.    On January 29, 2009, Textron filed a Form 8-K with the SEC, attached to which was a press release entitled "*Textron Reports Fourth Quarter and Full-Year Financial Results*,"

36

disclosing the following segment results for the fourth quarter 2008:

### Cessna

**Cessna's fourth quarter revenues and segment profit decreased $64 million and $90 million**, respectively, compared with the fourth quarter of 2007. Revenues decreased in spite of the sale of more jet units, primarily reflecting a higher proportion of Mustang sales. This decrease was partially offset by higher pricing and the benefit from the acquisition of the Columbia single engine product lines.

Segment profit decreased due to used aircraft valuation adjustments, the impact from lower revenue mix, higher product development expense and overhead costs.

Cessna backlog at the end of the fourth quarter was $14.5 billion, up $1.9 billion from the end of last year.

### Finance

**Finance revenues decreased $64 million in the fourth quarter** due to lower market interest rates, and lower securitization gains which were partially offset by the benefit of interest rate floors.

**Segment profit decreased $171 million** as a result of increased loan loss provisions, higher borrowing costs and lower securitization gains, partially offset by the benefit of interest rate floors.

Increased loan loss provisions reflected weakening general market conditions, declining collateral values and the lack of liquidity available to our borrowers and their customers. These provisions also incorporated estimates for an increase in expected credit losses resulting from TFC's exit plan.

Sixty-day plus delinquencies increased to 2.59% from 1.06% at the end of the third quarter. Nonperforming assets increased to 4.72% compared to 2.67% in the third quarter.

Managed receivables ended the year at $10.8 billion, versus $11.4 billion at the end of the third quarter.

(Emphasis added).

124.    Immediately following this disclosure, Textron common stock dropped to a

January 29 closing price of $9.03 per share on exceptionally high trading volume, marking a

decline of more than 31% compared to the closing price of $ 13.22 per share on January 28, 2009.

125.    On February 26, 2009, Textron filed a Form 10-K for the fiscal year ended January 3, 2009.  The 10-K stated that, "Segment profit decreased $116 million, or 7%, to $1.5 billion in 2008, compared with 2007. This decrease is primarily due to $272 million in reduced profits in the Finance segment, largely due to an increase in the provision for loan losses of $201 million." The 10-K further identified the following "Special Charges" taken by Textron:

> Special charges for the year ended January 3, 2009, include an initial mark-to-market adjustment of $293 million that was made when we reclassified certain finance receivables from held for investment to held for sale, a goodwill impairment charge in the Finance segment of $169 million and restructuring charges of $64 million. There were no special charges in fiscal 2007 or 2006.
>
> **As a result of the volatility and disruption in the credit markets**, and in order to reduce our reliance on short-term funding, on October 13, 2008, **our Board of Directors approved the recommendation of management to downsize the Finance segment.** The plan approved at that time entailed exiting the Finance group's Asset-Based Lending and Structured Capital businesses, as well as several additional product lines, and limiting new originations in the Distribution Finance, Golf Finance and Resort Finance businesses. On December 22, 2008, **our Board of Directors approved a plan to exit all of the commercial finance business of the Finance segment**, other than that portion of the business supporting customer purchases of Textron-manufactured products. **We made the decision to exit this business due to continued weakness in the economy** and in order to address our long-term liquidity position in light of continuing disruption and instability in the capital markets. In total, these actions will impact approximately $7.3 billion of the Finance segment's $10.8 billion managed receivable portfolio as of the end of 2008.  The exit plan will be effected through a combination of orderly liquidation and selected sales and is expected to be substantially complete over the next two to four years. We recorded a pre-tax mark-to-market adjustment of $293 million against owned receivables held for sale due to the exit plan. At January 3, 2009, approximately $2.9 billion of the liquidating receivables were designated for sale or transfer, of which about $1.2 billion represent securitized receivables managed by the Finance segment, and $1.7 billion represent owned receivables classified as held for sale.
>
> Based on current market conditions and the plan to downsize the Finance segment, we recorded a $169 million pre-tax impairment charge in the fourth quarter of 2008 to eliminate all goodwill at the Finance segment.

In October 2008, we initiated a restructuring program to reduce overhead cost and improve productivity across the company. On December 22, 2008, the Textron Board of Directors approved an expansion of this previously announced plan, which includes corporate and segment direct and indirect workforce reductions and streamlining of administrative overhead. **The program, along with other volume-related reductions in workforce during the fourth quarter of 2008 and in January 2009, eliminates approximately 6,300 positions worldwide, representing approximately 15% of our global workforce.**

We recorded pre-tax restructuring costs of $64 million in the fourth quarter of 2008 related to this restructuring program and the Finance segment exit plan, excluding volume-related direct labor reductions, which are recorded in segment profit. In the first half of 2009, we estimate that we will incur an additional $40 million in pre-tax restructuring costs, largely related to workforce reductions at Cessna. We may have additional restructuring costs as a result of further headcount reductions and other actions; however, an estimate of additional charges cannot be made at this time.

(Emphasis added).

126.   In its segment analysis for the Finance segment, Textron revealed that revenues decreased $152 million in 2008, compared with 2007, and profits decreased $272 million in 2008, compared with 2007, "primarily due to a $201 million increase in the provision for loan losses, a $51 million impact of higher borrowing costs, relative to market rates, $20 million in lower securitization gains, net of impairments, a $16 million lower gain on the sale of a leveraged lease investment, partially offset by a $24 million benefit from variable-rate receivable interest rate floors."

127.   At the close of trading on February 26, 2009, Textron common stock had fallen to a trading price of $5.76 per share, down another 36% compared to the closing price on January 29, 2009, the date that Textron issued its press release disclosing fourth quarter and full-year 2008 financial results.

128.   On April 29, 2009, Textron issued a Form 10-Q for the first quarter 2009, revealing a decrease in backlog within the Cessna segment that was attributable to "**cancelled**

39

**business jet orders due to the deepening recession**. Backlog does not take into account the ability of our customers to take delivery of the aircraft and the timing of such delivery due to the present credit scarcity and its effect on financing availability. **We have continued to experience cancellations since the end of the first quarter of 2009 and expect ongoing volatility in our Cessna backlog until economic conditions stabilize.**" (emphasis added).

129.   In its segment analysis, that Form 10-Q reported:

**Cessna**

In the first quarter of 2009, Cessna's revenues and segment profit decreased $477 million and $117 million, respectively, compared with the first quarter of 2008. Revenues decreased at Cessna primarily due to lower volume of $504 million, partially offset by higher pricing of $27 million. Cessna's volume reduction occurred in most of its product lines and is largely due to the $404 million impact of delivering 69 jets in the first quarter of 2009 compared with 95 jets in the first quarter of 2008.

Segment profit decreased primarily due to the $176 million impact from lower volume and $12 million in higher inventory write-downs for used aircraft, partially offset by a $50 million gain on the sale of assets and $14 million in pricing in excess of inflation. The gain on the sale of assets relates to CESCOM, which provided maintenance tracking services to Cessna's customers.

**Finance**

Revenues and segment profit decreased $92 million and $108 million, respectively, in the first quarter of 2009, compared with the first quarter of 2008

130.   On July 31, 2009, Textron issued a Form 10-Q for the second quarter 2009, providing the following bleak segment analysis for its Cessna and Finance segments:

**Cessna**

*Second Quarter of 2009*
Cessna's revenues decreased $630 million in the second quarter of 2009, compared with the corresponding period of 2008, primarily due to lower volume in business jets and other aircraft reflecting the impact of order cancellations and decreased demand. We delivered 84 jets in the second quarter of 2009, compared with 117 jets in the corresponding period of 2008, resulting in a $493 million reduction in revenues. Volume also declined for spare parts, product support and maintenance activities due to lower aircraft utilization, largely as a result of the

economic recession, which lowered revenues by $57 million. CitationShares volume decreased $24 million primarily due to lower demand.

Cessna's segment profit decreased $214 million in the second quarter of 2009, compared with the corresponding period of 2008, primarily due to the $220 million impact of lower volumes, which includes lower sales commissions. Segment profit was also impacted by a $38 million increase in writedowns of pre-owned aircraft inventory, reflecting lower fair market values due to an excess supply on the market, and $12 million due to idle capacity related to lower production levels and temporary plant shutdowns. These decreases were partially offset by $38 million in forfeiture income from order cancellations and $30 million in lower engineering, selling and administrative expense largely due to the workforce reduction over the first half of 2009.

*First half of 2009*
In the first half of 2009, Cessna's revenues decreased $1,107 million compared with the corresponding period of 2008, primarily due to lower volume in business jets and other aircraft reflecting the impact of order cancellations and decreased demand. We delivered 153 jets in the first half of 2009, compared with 212 jets in the corresponding period of 2008, resulting in an $897 million reduction in revenues. Volume also declined for spare parts, product support and maintenance activities due to lower aircraft utilization, largely as a result of the economic recession, which lowered revenues by $86 million. CitationShares volume decreased $45 million primarily due to lower demand.

In the first half of 2009, Cessna's segment profit decreased $331 million compared with the corresponding period of 2008, primarily due to a $396 million impact from lower sales volume, which includes lower sales commissions, partially offset by a $50 million gain on the sale of assets in the first quarter and $15 million in pricing in excess of inflation. The gain on the sale of assets relates to CESCOM, which provided maintenance tracking services to Cessna's customers. Segment profit was also impacted by a $50 million increase in writedowns of pre-owned aircraft inventory, reflecting lower fair market values due to an excess supply on the market, and $12 million due to idle capacity related to lower production levels. These decreases were partially offset by $50 million in forfeiture income from order cancellations and $27 million in lower engineering, selling and administrative expense largely due to the workforce reduction over the first half of 2009.

**Finance**

*Second Quarter of 2009*
Revenues for the Finance group decreased $91 million and segment profit decreased $112 million in the second quarter of 2009.

*First Half of 2009*

Finance segment revenues decreased $183 million and segment profit decreased $220 million in the first half of 2009.

131.    Moreover, Textron announced that:

In the fourth quarter of 2008, we initiated a restructuring program to reduce overhead costs and improve productivity across the company, which includes corporate and segment direct and indirect workforce reductions and streamlining of administrative overhead, and announced the exit of portions of our commercial finance business. **This program was expanded in the first half of 2009 to include additional workforce reductions, primarily at Cessna**, and the cancellation of the Citation Columbus development project. **We expect to eliminate approximately 10,000 positions worldwide representing approximately 23% of our global workforce at the inception of the program.** As of July 4, 2009, we have exited 11 owned and leased facilities and plants under this program.

(Emphasis added).

132.    Throughout the Class Period, Textron common stock plummeted from a Class Period trading high of $74.40 per share on December 10, 2007 to a Class Period trading low of $3.57 per share on March 6, 2009, a paramount decline in value of over 95%.

133.    Upon information and belief, Defendants regularly communicated with Plan Participants about the performance, future financial and business prospects of Textron's Cessna and Finance segments.  Textron and its officers and directors fostered a positive attitude toward Textron's stock and/or allowed Participants in the Plan to follow their natural bias towards investing in the equities of their employer by not disclosing negative material information concerning investment in the Textron Stock Fund.  As such, Participants in the Plan were not informed about the true risks presented by investing in the Textron Stock Fund and therefore could not make informed decisions regarding their investments in the Plan.

134.    Indeed, throughout the Class Period, Defendants disseminated to Plan Participants and filed with the SEC annual reports on Form 11-Ks and 10-Ks, and other public statements that were materially false and misleading.  The Plan documents incorporated by reference the

Company's false and incomplete SEC filings.   These and other SEC filings and related statements and releases were inaccurate, incomplete and materially misleading causing the Plan and its Participants to acquire, hold and maintain Plan investments in the Textron Stock Fund and to invest in the Textron Stock Fund instead of other, alternative investments in the Plan.

135.   Defendants either knew or should have known that Textron overstated its backlog of Cessna orders and understated the impact that a deteriorating U.S. economy and credit market crisis would have on Textron's Finance segment.   In turn, Defendants knew or should have known that this information made the Plan's continued investment in the Textron Stock Fund highly imprudent.

136.   In addition, as fiduciaries responsible for monitoring the investment of Plan assets, Defendants failed to review the performance of the other fiduciaries adequately to ensure that they were fulfilling their ERISA duties.

137.   By sitting idly by as the Plan and its Participants continued to invest in the Textron Stock Fund while such investment was imprudent, Defendants, as fiduciaries of the Plan, failed to protect the Plan and its Participants against lost profits and the inevitable diminution in vested benefits.   Consequently, the Plan suffered substantial losses.

**Insider Sales Of Textron Common Stock Should Have Raised Red Flags**

138.   Several of Textron's officers and directors did not share in the Plan's losses, however, as they apparently realized the imprudence of their investments in Textron common stock and sold their own shares before the stock price plummeted.   Between Textron's filing of its Form 10-Q on April 30, 2007 and its October 16, 2008 press release disclosing financial losses in its Finance Segment, a number of officers and directors, including Defendants Campbell and O'Donnell completed large stock sales, selling and disposing of **959,962** shares of

43

personally held Textron common stock for more than **$55 million** in proceeds.  Many of these

stock sales were priced at or near the Class Period trading high of $74.40 per share on December

10, 2007.  For example:

| **Name/Position** | **Date(s) of Sales(s)/ Disposition(s)** | **Number of Shares Sold** | **Sale/Disposition Price Per Share** | **Proceeds** |
|---|---|---|---|---|
| **Defendant Campbell** | 1/30/08 | 22,000 | $54.35 | $1,195,700 |
| | 2/12/08 | 7,130 | $56.40 | $402,132 |
| | 2/25/08 | 5,552 | $57.36 | $318,462 |
| | 4/28/08 | 77,019 | $61.34-$61.55 | $4,732,000 |
| | 4/28/08 | 27,645 | $60.50-$60.69 | $1,675,000 |
| | 4/28/08 | 36,825 | $60.71-$61 | $2,241,000 |
| | 4/28/08 | 104,983 | $61-$61.16 | $6,412,000 |
| | 4/28/08 | 236,988 | $61.16-$61.26 | $14,506,000 |
| | 4/28/08 | 108,582 | $61.26-$61.34 | $6,656,000 |
| | 5/5/08 | 3,225 | $61.98 | $199,885 |
| | 5/19/08 | <u>75,301</u> | $63.53 | <u>$4,783,872</u> |
| Total: | | 705,250 | | $43,122,051 |
| **Defendant O'Donnell** | 10/30/07 | 36,184 | $67.44-$68 | $2,450,000 |
| | 1/30/08 | 4,668 | $54.35 | $253,705 |
| | 2/12/08 | 1,593 | $56.40 | $89,845 |
| | 2/25/08 | <u>1,385</u> | $57.36 | <u>$79,443</u> |
| Total: | | 43,830 | | $2,872,993 |
| **Mary L. Howell,** Executive Vice President since August 1995. | 10/19/07 | 22,168 | $66.50-$67.70 | $1,487,000 |
| | 1/30/08 | 4,668 | $54.35 | $253,705 |
| | 2/12/08 | 1,548 | $56.40 | $87,307 |
| | 2/25/08 | <u>1,353</u> | $57.36 | <u>$77,608</u> |
| Total: | | 29,737 | | $1,905,620 |
| **Richard L. Yates,** Senior Vice President and Corporate Controller since August 2004, acting Chief Financial Offer between February 9, 2009 to July | 10/19/07 | 6,107 | $65.46 | $400,000 |
| | 10/29/07 | 14,332 | $68.40-$68.57 | $982,000 |
| | 1/15/08 | 4,000 | $62.57 | $250,280 |
| | 2/12/08 | 781 | $56.40 | $44,048 |
| | 2/15/08 | 3,332 | $56.39 | $187,891 |

| | | | | |
|---|---|---|---|---|
| 31, 2009. | 2/25/08 | 750 | $57.36 | $43,020 |
| | 5/21/08 | 75,301 | $63.88 | $792,000 |
| Total: | | 104,603 | | $2,699,239 |
| **Kenneth C. Bohlen,** Executive Vice President and Chief Innovation Officer since April 2000. | 10/19/07 | 26,800 | $66.15-$66.32 | $1,775,000 |
| | 2/12/08 | 1,383 | $56.40 | $78,001 |
| | 2/15/08 | 4,668 | $56.39 | $263,228 |
| | 2/25/08 | 1,554 | $57.36 | $89,137 |
| | 8/15/08 | 12,000 | $42.64 | $511,680 |
| Total: | | 46,405 | | $2,717,046 |
| **John D. Butler,** Executive Vice President Administration and Chief Human Resources Officer. | 9/7/07 | 10,000 | $57.05 | $570,500 |
| | 1/30/08 | 4,668 | $54.35 | $253,705 |
| | 2/12/08 | 1,593 | $56.40 | $89,845 |
| | 2/25/08 | 1,385 | $57.36 | $79,443 |
| Total: | | 17,646 | | $993,493 |
| **Ted R. French,** In February 2009, resigned from his positions as Executive Vice President and Chief Financial Officer. | 1/30/08 | 8,000 | $54.35 | $434,800 |
| | 2/12/08 | 2,616 | $56.40 | $147,542 |
| | 2/25/08 | 1,875 | $57.36 | $107,550 |
| Total: | | 12,491 | | $689,892 |
| **TOTAL:** | | **959,962** | | **$55,000,334** |

139.    The suspiciously large number and frequency of insider sales taking place prior to Textron's October 16, 2008 disclosure which sparked a plummet in stock price should have raised red flags for the Defendants, as fiduciaries of the Plan. In light of all of the officers and directors disposing of their shares of Textron stock at the same, or similar times, Defendants should have investigated the prudence of the Plan's continued investment in Textron stock during this time, and throughout the Class Period.

## Losses To The Plan And Its Participants

140.   Unaware that Textron would be unable to realize billions of dollars worth of unfilled jet orders that Textron had reported as backlog in its SEC filings, or that the national credit crisis would decimate Textron's Finance segment, the Plan's Participants invested substantial amounts of their retirement savings in the Textron Stock Fund at prices that were artificially inflated.

141.   When investors began to learn the truth about Textron's backlog of unfilled jet orders and downsizing of its Finance segment, Textron's stock price plummeted, taking with it Participants' vested retirement benefits in the Plan.  Because of Defendants' fiduciary breaches, the vested retirement benefits in the Plan have been significantly diminished and impaired.

142.   A prudent fiduciary acting under similar circumstances would have taken reasonable steps to prevent, or at least, minimize the losses sustained by the Plan and to preserve Participant's retirement savings.

143.   In fact, Defendants had available to them several different options for satisfying their fiduciary duty, including: (i) making appropriate public disclosures as necessary; (ii) divesting the Plan of Textron common stock; (iii) causing the Plan and its Participants to invest in alternative investments in the Plan instead of in the Textron Stock Fund; (iv) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; or (v) resigning as fiduciaries of the Plan to the extent that as a result of their employment by Textron they could not loyally serve Participants in the Plan in connection with the Plan's acquisition and holding of Textron common stock.

144.   Despite the availability of these and other options, Defendants failed to take *any* action to protect the Plan or its Participants from lost profits or a diminution of vested benefits as

a result of the Plan's investment in Textron common stock.

## CLAIMS FOR RELIEF UNDER ERISA

145.    At all relevant times, Defendants were, and acted as, fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

146.    ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

147.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any diminution of vested benefits to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

148.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and

(b)    A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

149.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> . . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(8), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless be makes reasonable efforts under the circumstances to remedy the breach.

150.    Plaintiff thus brings this action under the authority of ERISA § 502 for Plan-wide relief pursuant to ERISA § 409(a) to recover the lost profits and diminution of vested benefits and other losses sustained by the Plan arising out of Defendants' breaches of fiduciary duties.

## COUNT I

*Failure to Manage the Plan's Assets Prudently and Loyally.*
*Breaches of Fiduciary Duties in Violation of ERISA § 404*
*(Against All Defendants)*

151.    Plaintiff incorporates the allegations contained in the previous paragraphs of this

Complaint as fully set forth herein.

152. Defendants were responsible for the selection, maintenance and monitoring of the Plan's investment options, including the option to purchase and to hold investments in Textron common stock.

153. Defendants exercised discretionary authority and/or control over management of the Plan's or disposition of the Plan's assets and were, during the Class Period, responsible for ensuring that investment options made available to Participants were prudent. Defendants were responsible for ensuring that all investments in Textron common stock were prudent, and are liable for losses incurred as a result of such investments being imprudent.

154. Defendants either knew or should have known that Textron overstated its backlog of Cessna orders and understated the impact that a deteriorating U.S. economy and credit market crisis would have on Textron's Finance business. In turn, Defendants knew or should have known that this information made the Plan's continued investment in the Textron Stock Fund highly imprudent.

155. Based upon the size and number of sales of Textron common stock by insiders, including Defendants Campbell and O'Donnell, the Plan's fiduciaries should have recognized the imprudence of Participants continuing their investments in Textron common stock.

156. Participants, in contrast, invested in Textron common stock relying on the Company's financial misstatements and omissions and Defendants' continued offering of Textron common stock as an investment option under the Plan. Because Defendants never disclosed adverse, material information to Participants, at the time that Participants made such investments, Participants were without knowledge of the facts concerning the inaccurate statements and omissions alleged herein which revealed the imprudence of investing in Textron

common stock.

157.    Defendants breached their duties to prudently and loyally manage the assets of the Plan.    During the Class Period, upon the exercise of reasonable care, Defendants should reasonably have known that investment in Textron common stock was imprudent in that any such investment was unsuitable and inappropriate for either Participant contributions or company matching contributions to the Plan.    During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer the Textron Stock Fund as an investment option for the Plan and to direct and approve the Plan's investment in Textron common stock, instead of other investments as permitted by the Plan.    Despite the imprudence of any investment in Textron common during the Class Period, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Participants, from suffering substantial losses as a result of the Plan's investment in Textron common.

158.    Defendants also breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of the Plaintiff and the members of the Class, regardless of Defendants' own interests.

159.    Defendants also breached their fiduciary duties by failing to disclose that they had failed prudently and loyally to manage the assets of the Plan in the exercise of their discretion with respect to Textron common as an investment option in the Plan.

160.    As a direct and proximate result of Defendants' breaches of their fiduciary duties owed to the Plaintiff and the Class, the Plan, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants' are liable.

<u>COUNT II</u>

*Failure to Monitor the Plan and to Provide the Plan Administrator*
*and Other Fiduciaries with Complete and Accurate Information.*
*Breaches of Fiduciary Duties in Violation of ERISA § 404*
*(Against Textron, and the Director Defendants)*

161.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

162.   By virtue of their fiduciary responsibilities, the Defendants named in this Count were bound to monitor the other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plan and its investments.

163.   Upon information and belief, the Director Defendants maintained discretionary authority and control with respect to appointing the members of the Administrative Committee to manage and evaluate investment of the Plan's assets.   Accordingly, the Director Defendants breached their duties to monitor and inform by:

(a)   Failing to ensure that the Administrative Committee, as a monitored fiduciary, had access to knowledge about Textron's ability to fulfill its backlog of aircraft orders and the business condition of its Finance segment, as alleged above, which made Textron common stock an imprudent retirement investment;

(b)   Failing to ensure that the Administrative Committee appreciated the increased risk posed by the significant investment by rank and file employees in Textron common stock; and

(c)   Failing to disclose to the Administrative Committee accurate information about the operations and financial results of the Company which Defendants reasonably should have known the monitored fiduciaries needed to make sufficiently informed decisions about

what investment options the Plan should continue to offer.

164.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT III

*Failure to Provide Complete and Accurate*
*Information to the Plan's Participants and Beneficiaries.*
*Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405*
*(Against All Defendants)*

165.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

166.    During the Class Period, Defendants' fiduciary duties bound them to ensure that communications by and about the Plan and its assets were truthful, complete and not misleading, including information concerning the investment options offered under the Plan.

167.    Throughout the Class Period, Defendants failed to provide Plan Participants with complete and accurate information regarding the Company's operations, financial conditions, debt obligations, and access to financing necessary for Plan Participants to accurately assess the quality of an investment in Textron common stock.

168.    Instead, Defendants conveyed false and misleading material information to the investing public and to the Plaintiff and the Class, regarding the soundness of Textron common stock and the prudence of investing retirement savings in Textron common stock. Because large percentages of the Plan's assets were invested in Textron common stock during the Class Period, losses therefrom materially affected the value of Participants' retirement assets.

169.    Defendants' misrepresentations and omissions were material to the determination of Plaintiff and members of the Class whether investing in or maintaining their investments in

the Textron common stock was prudent. As such, Plaintiff and members of the Class are presumed to have relied to their detriment on Defendants' misleading statements and omissions.

170.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT IV

*Failure to Act Exclusively in the Interests of the Plan's Participants.*
*Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405*
*(Against All Defendants)*

171.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

172.    Defendants were duty bound to act with undivided loyalties to the Plan, binding them to discharge their responsibilities solely in the interest of Participants and for the exclusive purpose of providing benefits thereto.

173.    Defendants breached their duty of loyalty by:

(a)    Failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Textron common stock;

(b)    Failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transaction which made Textron common stock an unsuitable investment for the Plan;

(c)    Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(d)    With respect to each of the failures listed in the preceding subparagraphs, Defendants failed adequately to inform Plaintiff and members of the Class to prevent general

53

investors, creditors and others from discovering the Company's financial and operational weaknesses as well as its inability to fill and recognize revenue from its backlog orders; and

(e)     By otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Textron common stock, by among other things, keeping the Plan's assets heavily invested in Textron common stock when it was imprudent to do so - rather than divesting the Plan's investments in Textron common stock - while certain fiduciaries sold their personally held Textron common stock at artificially inflated prices.  As a result, certain fiduciaries personally profited from those sales while the Plan and its Participants suffered massive losses.

174.     As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

### COUNT V
Co-Fiduciary Liability.
Breaches of Fiduciary Duties in Violation of ERISA § 405
(Against the Director Defendants and the Administrative Committee)

175.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

176.     ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless

he makes reasonable efforts under the circumstances to remedy the breach.

177.    As alleged herein, Textron, through its officers and employees, such as the Director Defendants, and the Administrative Committee Defendants failed to provide material information to the Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices to the detriment of Plaintiff and members of the Class, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law. In addition, as alleged herein on information and belief, Textron and the other Defendants named in this Count participated in and/or knew about the Company's misrepresentations regarding its debt obligations and access to necessary financing.    Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Textron common stock as an investment for the Participants' retirement assets.

178.    Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of Textron common stock during the Class Period.    Defendants did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in Textron common stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A).    In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in Textron common stock despite knowing such failures were breaches of fiduciary duty under ERISA.    Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

179.    In further violation of ERISA § 405(a)(1)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet,

55

they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole. Instead, they compounded the problem by failing to disclose that a substantial portion of the Cessna segment's backlog of orders was comprised of orders made by purchases unable to finance those orders, and also by downplaying the detrimental impact that the nationwide credit crisis would have on Textron's Finance segment.

180.    In addition, the Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendants - including any appointed fiduciaries of the Plan - who lacked knowledge of the circumstances rendering Textron common stock imprudent, by failing to provide such persons with complete and accurate information regarding Textron common stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in Textron common stock. In so doing, these Defendants breached ERISA § 405(a)(1)(B).

181.    Further, through their failure to properly and effectively monitor their appointees on the Administrative Committee, and remove those fiduciaries whose performance was inadequate as alleged above, the Defendants named in this Count enabled these appointed fiduciaries' imprudent management of the Plan's investment in the Textron Stock Fund.

182.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants, lost a significant portion of their retirement investment.

183.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. §

1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.     A declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and its Participants;

B.     An Order compelling Defendants to (i) make good to the Plan all diminution of vested benefits to the Plan and all lost profits to the Plan resulting from Defendants' breaches of their fiduciary duties and (ii) to restore to the Plan any profits Defendants made by breaching their fiduciary duties;

C.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched as the result of breaches of fiduciary duty;

D.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.     An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Textron common stock or units maintained by the Plan in proportion to the account's diminution of vested benefits attributable to the decline in the price of Company stock and units in the Plan;

F.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.     An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

57

**JURY TRIAL DEMANDED**

Dated: September 9, 2009

By: _Robert S Parker_

Robert S. Parker, R.I. Bar No. 3152
**MCINTYRE, TATE & LYNCH, LLP**
321 South Main Street, Suite 400
Providence, RI 02903
Tel: (401) 351-7700
Fax: (401) 331-6095
Email: rsp@mtlesq.com

**HARWOOD FEFFER LLP**
Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**GLANCY BINKOW & GOLDBERG LLP**
Michael Goldberg
Richard A. Maniskas
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160
Email: rmaniskas@glancylaw.com

*Attorneys for Plaintiff*